J-S07002-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: A.R.E.F.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: R.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3142 EDA 2022 |

Appeal from the Order Entered October 31, 2022
In the Court of Common Pleas of Northampton County Orphans' Court at
No(s):  OC-2021-0059

| IN RE: K.Z.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: R.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3143 EDA 2022 |

Appeal from the Order Entered October 31, 2022
In the Court of Common Pleas of Northampton County Orphans' Court at
No(s):  OC-2021-0060

BEFORE:  DUBOW, J., KUNSELMAN, J., and KING, J.

MEMORANDUM BY DUBOW, J.:                    **FILED APRIL 21, 2023**

R.B. ("Father") appeals from the October 31, 2022 orders that involuntarily terminated his parental rights to his children, five-year-old K.Z.B. and four-year-old A.R.E.F.B. (collectively, "Children").  Upon review, we affirm.

In its October 31, 2021 Opinion, the trial court set forth a thorough and accurate procedural and factual history, as well as findings of fact, which we

adopt for purposes of this appeal. **See** Trial Ct. Op., filed 10/31/21, at 1-27. In sum, T.F. ("Mother") and Father are parents to Children.[1] Father is the biological Father of three additional children, who currently reside with their biological mothers.

Father has a history of domestic violence against Mother. In 2018, Mother and Father were living together when the Northampton County Department of Human Services, Children, Youth and Families Division ("the Agency") filed an Indicated Report of child abuse against Mother to Childline. The Report found that Father's 21-month-old child, who was not Mother's biological child, suffered non-accidental injuries, including a femur fracture, while the child was exclusively in Mother's care.[2] The Agency implemented a safety plan and services in Father and Mother's home to ensure the safety of then-two-month-old K.Z.B.

In June 2018, the trial court adjudicated K.Z.B. dependent and placed K.Z.B. in kinship care based on parents' non-compliance with the safety plan and services, as well as the Agency's concerns about domestic violence within the home and medical neglect of K.Z.B. The court ordered Father to complete a protective parenting evaluation, submit to random drug screens, participate

_____

[1] The trial court terminated Mother's parental rights to Children. Mother is not a party to this appeal.

[2] As a result of this incident, on December 22, 2021, Mother entered a *nolo contendere* plea to one count of Endangering the Welfare of a Child and the court sentenced her to five years of probation, with a condition that she cooperate with the Agency.

in parenting education and life skills training, attend visits with K.Z.B., demonstrate stable income and housing for six months, and notify the Agency regarding any changes in residence.

In July 2018, Mother received a temporary Protection from Abuse ("PFA") order based on allegations that Father had, *inter alia*, spit in her face, backed her into a corner, choked her, threw her cell phone down the stairs causing it to break, and prevented her from leaving their home by grabbing her scarf off her head and pushing her. However, Mother did not appear for the PFA hearing, which resulted in the court dismissing the temporary order.

In September 2018, Father participated in a protective parenting evaluation with Forensic Treatment Services ("FTS") which recommended that Father obtain treatment and complete a batterer's assessment. FTS discharged Father from treatment for missing too many sessions. Moreover, Father failed to appear three times for the batterer's assessment.

In August 2019, the trial court adjudicated then-one-month-old A.R.E.F.B. dependent and placed the baby in the same kinship care home as K.Z.B.

In June 2020, Father completed another protective parenting assessment as well as a batterer's assessment, which indicated that Father was at a moderate risk level for re-offending. The assessment recommended that Father complete a moderate intensity domestic violence batterers intervention or domestic violence program as well as protective parenting treatment and a mental health evaluation.

In April 2020, Father began a 16-week treatment program at Dynamic Counseling Associates but was discharged for non-compliance and barred from re-entering the program since this was his third referral.

In April 2021, the Agency referred Father to Diakon Family Reunification Program to assist him with his reunification goals, including obtaining stable housing, following through with protective parenting treatment sessions, participating in visitation with Children, and obtaining parenting education. Father was discharged for missing too many appointments.

In March 2022, Father completed a third protective parenting evaluation with Pennsylvania Forensics but failed to begin the recommended treatment.

Father participated in parenting education services through St. Luke's VNA but was unsuccessfully discharged after being hostile to staff. The Agency also referred Father to Lehigh Families Together for parenting education, which also discharged Father for noncompliance.

Since 2020, Father has informed the Agency that he was living at various addresses with friends and family. Although the Agency assisted Father in completing housing applications with the Easton Housing Authority, Father has failed to provide the Agency with a permanent address or proof to demonstrate that he had stable income or employment.

Since the start of the case, Father has missed 78 random drug screens, submitted to 13 drug screens, and tested positive for marijuana 11 times.[3]

---

[3] These drug screens were prior to Father obtaining a medical marijuana card.

On August 13, 2021, the Agency filed petitions to involuntarily terminate Father's parental rights ("TPR petitions") to Children.

The trial court held hearings on the TPR petitions on June 27, 2022, July 14, 2022, and August 11, 2022, when K.Z.B. and A.R.E.F.B. were four and three years old, respectively. With regards to Father, the Agency presented testimony from Melissa Mulero, Diakon caseworker; Alyson Wogenrich, Dynamic Counseling Associates program coordinator; Kristen Cooper, Agency investigation supervisor; Abigail Manning, Agency caseworker; and Janel Fortun; Agency caseworker, each of whom testified in accordance with the above recitation of facts.

In addition, Ms. Wogenrich from Dynamic Counseling Associates testified as an expert in risk identification and mitigation efforts regarding domestic violence. Ms. Wogenrich testified that Father posed a risk of reoffending and that her agency recommended that Father participate in a moderate intensity domestic violence batterer's intervention or a domestic violence program, protective parenting treatment, and a mental health evaluation to assess for further treatment recommendations. She explained that all three were necessary to mitigate Father's risk to reoffend. Ms. Wogenrich concluded that because Father failed to complete the recommended programs, he was at the same risk to his Children as he was initially.

Ms. Fortun testified that the Children have been in kinship care with Mother's cousin, C.F. ("Foster Mother"), since the trial court adjudicated K.Z.B. and A.K.E.F.B. dependent in June 2018 and August 2019, respectively. Foster Mother is an adoptive resource for Children as well as for an older half-sibling who is not a party to this case. Ms. Fortun explained that Children have a strong bond with Foster Mother, call Foster Mother "Mom," and go to Foster Mother for all of their needs, including their emotional needs. Ms. Fortun stated that Children have expressed that they love Foster Mother, want to live with her, and wish to be adopted by her. Ms. Fortun testified that Children "just have flourished and really opened up since they have been with [Foster Mother]. She loves them and has made them part of her own family." N.T. Hearing, 8/11/22, at 45.

Ms. Fortun further explained that although Father was consistent with supervised visitation with Children, he would often debate the rules of the Agency and try to include Mother in the visits, despite instructions from caseworkers that it was too distracting for Children. She stated that the Agency had to move the supervised visitation to every other week so that Mother and Father would be there at opposite times. Finally, Ms. Fortun informed the court that she believed Father was currently living with Mother because she observed male clothing and court papers with Father's name on them in Mother's home.

The court also heard testimony from Father. Father denied that he was still in a romantic relationship with Mother or that he was living with her.

Father informed the court that he had been employed by an agency called PeopleReady for the past six months loading trucks and that he currently lives with his brother. Father explained that he did not provide information to the Agency to verify his employment because he "tends to forget" because he is "frustrated and overwhelmed with a lot of things." *Id.* at 88. When asked about his relationship with Mother, Father admitted that he had hit and kicked her, stating, "Honestly, yes. I was abusing her." *Id.* at 92. Father acknowledged that his anger management and domestic violence issues have not been resolved. When confronted with the fact that he had not completed services, Father testified, "honestly, I'm not going to say that I don't want to reunify with my kids, but honestly I feel as though I don't deserve to have my children. I don't." *Id.* When asked what he did to perform his parental duties, Father responded, "Honestly, I've pretty much did what I did. I did what I could. Obviously, it's not enough. I didn't complete some things, yes, but I still attempted to. It's not like I just said no, I don't want to do it. I tried to do it instead of just saying no. I can't do it. I still tried to do it." *Id.* at 95.

Nevertheless, Father testified that he does not want his parental rights terminated. He stated that he has a bond with Children and they call him daddy. He further stated that he is "absolutely" ready to take Children home to his brother's house and that he has a large family support system to assist him. *Id.* at 96-97. Father explained that he wants to be a better person.

On October 31, 2022, the trial court issued an Opinion and Final Decree terminating Father's parental rights to Children pursuant to Sections 2511(a)(1), (2), (5), (8), and (b). The GAL agreed with this disposition.

Father timely appealed and filed a contemporaneous Pa.R.A.P. 1925(b) statement. The trial court relied on its October 31, 2022 opinion in lieu of a Rule 1925(a) opinion.

Father raises the following issues for our review:

1. Whether the trial court erred in finding that Father has caused [] Children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by Father? (2511) (a)(2)

2. Whether the trial court erred in finding that Father has evidenced a settled purpose of relinquishing parental claim to Children or has failed to perform h[is] parental duties without adequate explanation for her conduct? (2511) (a)(1)

3. Whether the trial court erred in finding that [] Children have been removed from the natural parent for a period of at least six months, and the conditions which led to the removal or placement of [] Children continue to exist, and Mother cannot or will not remedy those conditions within a reasonable period of time, and termination of parental rights best serves the needs and welfare of [] Children? (2511) (a)(5)

4. Whether the trial court erred in finding that [] Children have been removed from the natural parent for a period of at least twelve months, and the conditions which led to the removal or placement of [] Children continue to exist, and Mother cannot or will not remedy those conditions within a reasonable period of time, and termination of parental rights best serves the needs and welfare of [] Children? (2511[) ](a)(8)

5. Whether the trial court erred in finding that termination will meet the needs and welfare of [] Children? (2511) (b)

Father's Br. at 4-5 (some capitalization changed; renumbered and reordered for ease of disposition).

**A.**

In addressing Father's issues, we are mindful of our well settled standard of review. When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. "Initially, the focus is on the conduct of the parent." *In re Adoption of A.C.*, 162 A.3d

1123, 1128 (Pa. Super. 2017) (citation omitted). "The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* (citation omitted). "[I]f the court determines that the parent's conduct warrants termination of his or her parental rights[,]" the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted). Notably, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008). We concentrate our analysis on subsection 2511(a)(2).

**B.**

In his first issue, Father avers, *inter alia*, that the trial court abused its discretion when it terminated his parental rights pursuant to Section 2511(a)(2). Father indicates that he "understands that he must take steps to remedy the conditions that led to the removal of [C]hildren" and is willing to "develop insights into better parenting." Father's Br. at 18. Father argues that the trial court failed to consider that he continues to provide financial support for Children. *Id.*

Section 2511(a)(2) provides for termination of parental rights where the petitioner demonstrates by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused

the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2); *In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012). The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may also include acts of refusal as well as incapacity to perform parental duties. *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019). Notably, a "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010).

Finally, sincere efforts to perform parental duties may still be insufficient to remedy an incapacity. *Id.* at 1117. This is because subsection (a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being[,]" especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *Id.* (citation omitted).

Applying these principles, the trial court concluded that Father's refusal to consistently participate in services and failure to make progress towards the completion of his court-ordered goals has prevented Father from providing

essential parental care to Children.  The trial court emphasized that Father has failed to complete domestic violence counseling or parenting education, or indeed any of his court-ordered goals, and continues to pose a risk to Children.  Trial Ct. Op. at 38.  Moreover, the trial court credited Ms. Wogenrich's testimony that Father posed a safety risk to Children, as well as Father's own testimony that he did not deserve to parent Children.  *Id.*  The trial court opined:

> With respect to [Father], he has a history of domestic violence toward Mother, which has affected the household in which [] Children were present.  This [c]ourt places great weight upon the testimony of Mrs. Wogenrich, who testified as an expert in risk identification and mitigation efforts regarding domestic violence[] that because [Father] failed to complete his recommended and court-ordered programs, he poses the same amount of risk to his family members as he initially did.
>
> At the time of the hearing, [Father] was unable to demonstrate that he had stable employment and housing sufficient for [Children] and he admitted that he believes he does not deserve to parent them.  Before [Father] could regain custody of [] Children, he would have to demonstrate stable employment and income, appropriate housing, and complete protective parenting services and parenting education services.  In addition, he would have to address his issues with anger management and domestic violence through therapy.  Given the above, including [Father]'s history of hostility and domestic violence and his failure to address those issues, the [c]ourt finds that [Father] is incapable of providing parental care and is unlikely to remedy his incapacity at any point in the future.  Accordingly, the [c]ourt finds that [the Agency] has carried its burden under [S]ection 2511(a)(2) with respect to [Father].

*Id.*

Our review of the record supports the trial court's findings, and we decline to reweigh the evidence or usurp the trial court's credibility

determinations. Father's argument that he is now, at the last hour, willing to engage in services is disingenuous at best. Father's refusal to consistently engage in services, complete court-ordered goals, or cooperate with the Agency has posed a continued safety risk to Children and rendered him incapable of providing essential parental care to Children. Accordingly, we find no abuse of discretion.

**C.**

In his next issue, Father avers that the Agency failed to establish by clear and convincing evidence that termination would be in Child's best interest. Father's Br. at 20. Father argues that he and Children have a bond of love and affection. *Id.* Father further argues that he has been consistent with visitation and Children enjoy the visits with him. *Id.*

With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. This Court reviews whether "termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005).

One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, "with close attention paid to the effect on the child of permanently severing

any such bond." ***In re Adoption of N.N.H.***, 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). The fact that a child has a bond with a parent does not preclude the termination of parental rights. ***In re A.D.***, 93 A.3d 888, 897 (Pa. Super. 2014). Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. ***Id.*** at 898. Moreover, the trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the adoptive resource. ***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011). Ultimately, the concern is the needs and welfare of the child. ***In re Z.P.***, 994 A.2d 1108, 1121 (Pa. Super. 2010).

Instantly, the trial court discredited Father's testimony that he had a bond with Children, and, instead, credited Ms. Fortun's testimony that Children are extremely bonded to their Foster Mother, who they call "Mom," and that Children wish to be adopted by her. Trial Ct. Op. at 44-45. The trial court found:

> Here, for over a year, [] Children have resided together with their cousin, [Foster Mother], to whom they look for love and nurturing and with whom they have bonded. [] Children know their primary caretaker to be [Foster Mother], who has resumed all parental duties for them for an extended period of time and who has provided them with a safe household in the company of her own children with whom [] Children have bonded.

***Id.*** at 44. Conversely, the court observed, "[w]e did not hear testimony about a strong emotional attachment between [Father] and [Children]." ***Id.*** at 45. Since there was no credible evidence presented regarding a parental

- 14 -

bond between Father and Children, the court concluded that terminating Father's parental rights would not irreparably harm Children. The court found, however, that removing Children from Foster Mother's home would in fact cause Children to experience trauma. The trial court opined:

> Thus, the termination of the parental rights of [Father] would not disrupt any significant parental attachment with [] Children. Conversely, we find that severing the bond the Children have with [Foster Mother] and her children would cause trauma to [] Children. Thus, the [c]ourt finds that [the Agency] has carried its burden of providing that termination of the parental rights of [Father] would serve [] Children's needs and welfare.

*Id.* at 45. As the record supports the trial court's findings, we discern no abuse of discretion.

### D.

In conclusion, our review of the record supports the trial court's findings. We discern no error of law or abuse of discretion with respect to the trial court's conclusion that the Agency presented clear and convincing evidence to terminate Father's parental rights pursuant to Section 2511(a) and (b).

Orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/21/2023